IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

PATRICIA A. FIELDER,
   Plaintiff,

vs.           Case No.: 5:12cv383/MCR/EMT

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,[1]
   Defendant.
_____/

## ORDER and REPORT AND RECOMMENDATION

   This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401, *et seq.*  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34.

   Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

I.  PROCEDURAL HISTORY

   On June 3, 2008, Plaintiff filed an application for DIB and alleged therein disability beginning December 4, 2006 (tr. 34).[2]  Her application was denied initially and on reconsideration, and Plaintiff then requested a hearing before an administrative law judge ("ALJ").  A hearing was held on January

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Fed. R. Civ. P. 25(d), she is therefore automatically substituted for Michael J. Astrue as the Defendant in this case.

[2] All references to "tr." refer to the transcript of Social Security Administration record filed on February 28, 2013 (docs. 10, 11, 12).  Moreover, the page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system or any other numbers that may appear.

27, 2011, and on February 14, 2011, the ALJ issued a decision in which he found Plaintiff "not disabled," as defined under the Act, at any time through September 30, 2010, the date Plaintiff was last insured for DIB purposes[3] (tr. 34–41).  On November 13, 2012, the Appeals Council denied Plaintiff's request for review (tr. 2), which made the decision of the ALJ the Commissioner's final determination, subject to review in this court.  *See* Poellnitz v. Astrue, 349 F. App'x 500, 501 (11th Cir. 2009) (unpublished) ("When the ALJ denies benefits and the AC denies review, we generally review the ALJ's decision as the Commissioner's final decision."); *see also* Ingram v. Comm'r of Soc. Sec., 496 F.3d 1253, 1262, 1265–66 (11th Cir. 2007) ("a reviewing court must consider whether that new evidence [submitted to the AC] renders the denial of benefits erroneous").  This appeal followed.

II.     FINDINGS OF THE ALJ

The ALJ made the following findings relative to the issues raised in this appeal (tr. 34–41):

a)      Plaintiff did not engage in substantial gainful activity during the relevant period.

b)      Plaintiff had two severe impairments during the relevant period, back pain status-post lumbar spine compression fracture repair and history of a transient ischemic attack, but she had no impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

c)      Plaintiff had the residual functional capacity ("RFC") to perform the full range of sedentary work during the relevant period, and thus she could perform her past relevant work as a customer service representative and, correspondingly, was not disabled.

III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence and whether the correct legal standards were applied.  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002); Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997).  "Substantial evidence is something more than a mere scintilla, but is less than a preponderance," Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (quotation marks and citations omitted), and "is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158 (11th Cir. 2004)

_____

[3] Thus, the time frame relevant to this appeal is December 4, 2006 (alleged onset) through September 30, 2010  (date last insured), which time frame will hereafter be referred to as the "relevant period."

(quotation marks and citations omitted). "Even if the evidence preponderates against the Commissioner's findings," the Commissioner's decision must be affirmed if it is supported by substantial evidence. *Id.* at 1158–59 (quotation marks and citations omitted). "The court need not determine whether it would have reached a different result based upon the record," Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991), and should not substitute its judgment for that of the Commissioner. Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982).

A claimant applying for disability benefits must prove she is disabled. 20 C.F.R. § 404.1512; Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). The Social Security Regulations outline a five-step sequential evaluation process for determining whether a claimant is disabled. 20 C.F.R. § 404.1520; Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999). At the first step, the claimant must show that she has not engaged in substantial gainful activity. Jones, 190 F.3d at 1228. At the second step, she must prove she has a severe impairment or combination of impairments. At step three, if her impairment meets or equals a listed impairment, she is automatically found disabled. If her impairment does not meet or equal a listed impairment, she must prove, at step four, that she is unable to perform her past relevant work. Finally, if a claimant proves she cannot perform her past relevant work, the burden shifts to the Commissioner at step five to show that there is other work available in significant numbers in the national economy that the claimant is able to perform. *Id.*

IV.    PLAINTIFF'S PERSONAL, EMPLOYMENT, AND MEDICAL HISTORY

A.    Personal and Employment History

Plaintiff was born on August 14, 1954 (tr. 190), and was between the ages of fifty-two and fifty-six during the relevant period. She has a high school education and past relevant work as a customer service representative, which she performed at a sedentary level of exertion, and home health aide, which she performed at a medium level of exertion (tr. 50–51).

During her hearing before the ALJ, Plaintiff generally testified that she experiences disabling pain, limitations, and other symptoms due to a lower back injury (*see* tr. 51–77). When asked what might prevent her return to work as a customer service representative, Plaintiff indicated that she would have difficulty driving to the job and, once there, concentrating and dealing with people due to a loss of concentration (tr. 68–69). In response to later questioning, Plaintiff testified that if "it

weren't for [her] back and leg problems" she would be able to work, although the later questioning concerned work in general, not specifically her work as a customer service representative (*see* tr. 75).

B.    Relevant Medical History

On December 4, 2006, Plaintiff was attempting to lift a patient off the floor at work when she "felt and heard a 'pop' in her back" and began to experience severe pain (tr. 395).  She was transported to an emergency room where "unremarkable" x-rays of the lumbar spine were obtained, and Plaintiff was evaluated, treated conservatively, and released (tr. 393, 395).  The following day Plaintiff presented to Merle Stringer, M.D., with complaints of lower back pain without radiation, numbness, weakness, paresthesia, or bladder dysfunction (tr. 395).  On examination, Dr. Stringer noted thoracic and lumbar paravertebral muscle spasm, moderate limitation of back flexion and extension secondary to non-radicular pain, and tenderness to palpation over both sacroiliac ("SI") joints and the facet joints, bilaterally, at L4-5 and L5-S1 (tr. 394).  A straight leg raising ("SLR") test produced some mild lower back pain (tr. 393), but otherwise the examination was normal (*see id.* (reflecting in relevant part normal lower extremity strength, hip flexion and extension, deep tendon reflexes, and gait)).  Additionally, computerized tomography ("CT") of the lumbar spine, obtained December 6, 2006, revealed minimal lumbar spondylosis with diffuse osteopenia but no definite disc herniation or spinal stenosis (tr. 391–92).  Dr. Stringer restricted Plaintiff from work for at least one week; assessed status post lifting type injury, low back pain with no evidence of lumbar nerve root compression or cauda equina compression, SI joint tenderness, and bilateral lumbar facet irritation at L4-5 and L5-S1; referred Plaintiff for physical therapy ("PT"); and prescribed pain medication (tr. 393).

Plaintiff returned to Dr. Stringer's office on December 12, 2006, and saw Douglas L. Stringer, M.D. (tr. 388).[4]  She reported continued back pain and stated she had not yet started PT (tr. 390).  Plaintiff's physical examination was essentially the same as before, as were the diagnoses assessed

---

[4]Neurologists Douglas Stringer and Merle Stringer—who work in the same facility (the Brain and Spine Center, L.L.C. (*see, e.g.*, tr. 395))—each treated Plaintiff during the relevant period.  For the sake of simplicity, the court will hereafter refer to these physicians as one individual, "Dr. Stringer."

by Dr. Stringer (*see* tr. 389–90).  Dr. Stringer advised Plaintiff to begin PT as soon as possible and stated she should remain off work (tr. 389).[5]

On January 11, 2007, upon referral by Dr. Springer, Plaintiff underwent magnetic resonance imaging ("MRI") of the lumbar spine (tr. 385).  The MRI revealed a compression deformity of L5 with a height loss of approximately 20% and "an interval development of an annular tear" at L4-5 (tr. 386).  After reviewing the MRI and examining Plaintiff, Dr. Stringer prescribed a lumbar brace and scheduled a whole body scan (tr. 382), which Plaintiff obtained on January 23, 2007 (tr. 380).  The scan revealed an "uptake in [the] lower lumbar spine," which was consistent with degenerative disease (at L4-5 and L5-S1) (*id.*).  Plaintiff continued to treat with Dr. Stringer from January through March 2007, and based on Plaintiff's continued complaints of pain Dr. Stringer administered lumbar facet injections at L4-5 and L5-S1 (*see, e.g.*, tr. 376, 378).  Dr. Stringer also prescribed Lortab for pain and Zanaflex for muscle spasm (tr. 370, 378).  On February 20, 2007, Plaintiff reported that the injections initially improved her pain, but the pain had recurred (tr. 375).  She underwent additional injections, and Dr. Stringer recommended that Plaintiff return to work with "no heavy lifting" (tr. 374; *see also* tr. 371, 363, 356, reflecting additional injections in March, April, and May 2007).

A lumbosacral spine x-ray was obtained on April 4, 2007, and revealed an irregularity at L5 (tr. 367), as was seen on the January 2007 MRI (i.e., the compression deformity) and which appeared to be unchanged since the MRI (*see* tr. 365).  And a thoracic spine CT was obtained on April 27, 2007 (tr. 357).  The CT revealed kyphosis and likely osteopenia but no evidence of an acute compression fracture, metastatic disease, or spinal stenosis (*id.*).   Also in April 2007, Dr. Stringer examined Plaintiff and noted some evidence of paravertebral muscle spasm and moderate limitation of back flexion and extension, secondary to non-radicular lower back pain, but Plaintiff exhibited full strength in her lower extremities, normal sensation, equal and symmetrical deep tendon reflexes, negative Babinski testing, and a normal gait (tr. 365).

On May 3, 2007, Dr. Stringer performed an open reduction and internal fixation of the compression fracture at L5, with kyphoplasty (tr. 354).  The surgical report indicates that a

---

[5]A treatment record dated January 15, 2007, reflects that Plaintiff had completed PT (tr. 384).  Thus, although there are no PT records in the file, it appears that Plaintiff underwent a short course of PT between (approximately) December 12, 2006, and January 15, 2007.  She reported, however, that the PT resulted in only "minimal improvement in her symptomatology" (*id.*)

kyphoplasty balloon was inserted and expanded at two different areas on the left and right side of L5 and that at each area Dr. Stringer was able to achieve some movement of the end plate to a more normal position (*id.*). Additionally, the void created by the balloon was successfully filled, with no extrusion of the cement material within the canal (*id.*). Plaintiff was discharged from the hospital the following day (tr. 352).

Plaintiff returned to Dr. Stringer for follow-up on May 15, 2007, and reported "significant improvement" in her symptoms, although she was not totally pain free (tr. 352).[6] She also reported some numbness in her feet but denied difficulty with ambulation (*id.*). Examination revealed some muscle spasm and moderate limitation of back flexion and extension, secondary to pain, which was localized in Plaintiff's lower back and described as non-radicular (tr. 351).

On May 17, 2007, Plaintiff presented to an emergency room with complaints of back and leg pain (*see* tr. 316). Lumbosacral spine x-rays revealed degenerative disc disease ("DDD") at L5-S1, the vertebral repair at L5, and mild degenerative changes of the articular facets (tr. 349). She returned to Dr. Stringer one week later and reported pain in her back and lower extremities, paresthesia in the lower extremities, and "increasing difficulty" since the kyphoplasty (tr. 348). Upon examination, Dr. Stringer noted moderate tenderness of the lumbar spine, limitation of forward bending to 70% of normal, and back pain with SLR tests (tr. 347). Sensory examination showed spotty loss of sensation to pinprick in both feet and a limping gait (*id.*). Dr. Stringer prescribed a course of steroids, Lyrica, and Flexeril and instructed Plaintiff to increase her Lortab dosage to one every six hours for pain (*id.*). On June 1, 2007, Plaintiff saw Dr. Stringer and stated she was "much better" with the steroids but had experienced an increase in pain in her back and legs, with leg numbness, when she tried to do laundry (tr. 346). The results of Dr. Stringer's examination were similar to those obtained in late May (*compare* tr. 345 *with* tr. 347). Dr. Stringer assessed lumbar disc disease causing low back and leg pain with paresthesias of the lower extremities, some evidence suggestive of nerve root irritation and/or compression, "some increasing difficulty after doing some laundry work," and history of L5 kyphoplasty with "significant improvement in her bone pain from the compression fracture[]" (tr. 345). Dr. Stringer prescribed Lortab, to be taken once every twelve hours for pain, and Lyrica, and he

---

[6]Previously, on May 8, 2007, Plaintiff called Dr. Stringer and stated she was experiencing leg cramps despite taking Zanaflex, and had back and hip discomfort when sitting (tr. 352). Dr. Stringer called the pharmacy and switched Plaintiff from Zanaflex to Flexeril (*id.*).

scheduled additional testing (i.e., a lumbar MRI and electromyogram and nerve conduction velocity ("EMG-NCV") studies) pending authorization by the workers' compensation insurer (tr. 344).

On June 13, 2007, Plaintiff reported that she was "much better" (tr. 344). More specifically, she reported that she was walking more and experiencing less back pain, leg pain, and paresthesia (*id.*). A physical examination was generally the same, and Dr. Stringer continued—but increased the dosage of—the Lyrica (tr. 342). Dr. Stringer's diagnoses remained the same (*id.*).

The EMG-NCV testing was conducted on June 19, 2007. The NCV study, which was of the lower extremities, was normal (tr. 306), but the EMG was "suspicious for [or consistent with] L5-S1 radiculopathy" (tr. 336, 306). The lumbar spine MRI was obtained on June 26, 2007, and revealed minimally bulging disc material at the lower three lumbar levels with no focal disc abnormality, nerve root impingement/compression, or spinal stenosis (tr. 337, 340).[7] Plaintiff exhibited some evidence of paravertebral muscle spasm and moderate limitation of back flexion and extension secondary to pain (tr. 337).

On July 26, 2007, Plaintiff saw Dr. Stringer and reported "very little pain in her back" but some parethesia at the S1 area, bilaterally, worse on the right (tr. 335). Plaintiff also stated she was walking more but doing so caused some increased back pain (*id.*). Dr. Stringer advised Plaintiff to increase her activity, stay off work for two more weeks, and then return to light duty work with lifting of no more than twenty pounds (tr. 333). On August 27, 2007, Plaintiff reported ongoing pain and muscle spasm in her back, worse with increased activity, as well as occasional paresthesias of her left leg (*id.*). Dr. Stringer noted that Plaintiff had "good" pain relief with medication and an "adequate" activity level (tr. 330). In late September 2007, after Plaintiff had apparently resumed PT, she told Dr. Stringer that PT was making her symptoms worse, and she complained of back, leg, and foot pain with numbness in the feet (tr. 329). Following a physical examination, which yielded largely the same results as prior examinations (*see* tr. 328), Dr. Stringer advised Plaintiff there were no available neurosurgical treatment options and, from a "neurosurgical standpoint, she ha[d] reached maximum medical improvement" ("MMI") with an 8% impairment rating "based on the Florida

---

[7] Thus, although Dr. Stringer had previously assessed lumbar disc disease "with some evidence suggestive of nerve root irritation and/or compression" (tr. 342, 345), after reviewing the MRI that revealed no evidence of nerve root impingement or compression (tr. 337, 340), his diagnosis changed to "lumbar disc disease . . . [with] no evidence of lumbar nerve root compression" (*see, e.g.*, tr. 336).

Impairment Guidelines," with 5% based on the compression fracture at L5 and 3% for the back spasms and "loss of mobility" (tr. 327–28). He also noted that Plaintiff would be referred for a functional capacity assessment ("FCA"),[8] and he released Plaintiff "to return to work at light duty" (*see* tr. 327).

On October 19, 2007, Plaintiff saw Mark Akerson, M.D., a family care physician, and complained of lower back swelling with pain and numbness from the knees through the feet (tr. 451). Upon examination, Plaintiff had mild lower lumbar pain and some spasm, as well as limited range of motion and pain with movement (*id.*). Dr. Akerson assessed back pain, weakness, and numbness, and he prescribed medication for inflammation (meloxicam and Flexeril) but noted Plaintiff would need to get prescriptions for Lyrica and Lortab from a workers' compensation physician (*id.*).

On January 30, 2008, Plaintiff presented to the Tallahasee Neurological Clinic, P.A., and primarily complained of back pain, which she stated began on December 4, 2006, and foot pain, which reportedly began on May 3, 2007 (*see* tr. 409). She stated that the May 2007 kyphoplasty worsened her back pain and coincided with the onset of the pain, numbness, and/or tingling in her lower extremities (*id.*). Joshua Fuhrmeister, M.D., noted that Plaintiff was taking Lortab and Lyrica, and that according to Plaintiff her medications relieved 70% of her pain (tr. 414). Upon examination, Plaintiff had a mildly antalgic gait but a normal station, minimal lumbar spine tenderness, and (as reported by Plaintiff) pain with range of motion (tr. 418). SLR testing was negative, and strength and sensation in the lower extremities were normal (*id.*). Dr. Fuhrmeister opined that "the etiology of her ongoing low back pain and leg pain is unclear" (*id.*). He assessed low back pain, closed lumbar fracture, and lumbar radiculopathy, and he discussed with Plaintiff possible treatment options, including increased use of Lyrica and a lumbar epidural steroid injection ("ESI") (tr. 418–19). Plaintiff chose the latter option (and the ESI was administered in early February 2008) (tr. 418, 420). Dr. Fuhrmeister also completed workers' compensation forms (hereafter "WC forms") and opined—by checking boxes—that Plaintiff had not yet reached MMI and was not able to perform even sedentary exertional activities (tr. 413). Plaintiff returned to Dr. Fuhrmeister on February 26, 2008 (tr. 423). She complained of back pain and leg weakness, and she stated that the ESI had not helped and that her pain had actually increased following the ESI (*id.*). A physical examination was largely normal. More

---

[8]The FCA was conducted on October 2, 2007 (tr. 311–15), and the results of this FCA are included, *infra*, in section IV.D. of this Report.

specifically, strength and sensation were normal in the upper and lower extremities; Plaintiff's station was normal; SLR tests were negative, bilaterally, as was rotation of the hips; and Plaintiff had only minimal lumbar tenderness over the paraspinal muscles (*id.*).  The only abnormalities noted were a mildly antalgic gait and, per Plaintiff's report, pain with lumbar movement (*id.*).  Dr. Fuhrmeister again stated that the etiology of her back pain was unclear, and he could not explain the symptoms Plaintiff reported following the ESI (tr. 427).  He ordered a MRI and noted that Plaintiff was poor surgical candidate, "[r]egardless of what the MRI shows" (*id.*).  Dr. Fuhrmeister also filled out additional WC forms (tr. 421–22).  On these forms, Dr. Fuhrmeister did not opine—by checking boxes or otherwise—that Plaintiff had not yet reached MMI or was unable to perform even sedentary exertional activities (*see* tr. 422, reflecting that Dr. Fuhrmeister failed to respond to the questions in this regard).

Plaintiff obtained the lumbar MRI on March 17, 2008 (tr. 428).  It revealed spondylosis at L3-4 through L5-S1, the prior vertebral healed fracture with vertebroplasty at L5, and dehydration and shrinkage of the L4-5 discs, but no evidence of root effects at any of these levels (*id.*).

Plaintiff returned to Dr. Fuhrmeister on March 26, 2008 (tr. 431).  Dr. Fuhrmeister's treatment notes are essentially the same as those from Plaintiff's earlier visits, with the exception of his diagnoses and notes as to Plaintiff's complaints.  With regard to the diagnoses, after review of the recent MRI Dr. Fuhrmeister no longer assessed lumbar radiculopathy (*see* tr. 434–35).  With regard to Plaintiff's complaints, on this occasion she reported additional symptoms of headaches, fingernail changes, and skin color changes at the feet (tr. 435).  Dr. Fuhrmeister again stated he could not explain Plaintiff's symptoms (*id.*).  Additionally, he opined that Plaintiff was at MMI from a pain management perspective, and he adopted the restrictions from the FCA (*see id.*), which—as explained *infra*—are for sedentary work.  Plaintiff returned on May 23, 2008, and advised Dr. Fuhrmeister that if "she was not taking the medication [i.e., Lortab and Lyrica] she would be in severe pain" (tr. 438).  The treatment notes reflect complaints of ongoing low back and leg pain, which Plaintiff described as "severe with prolonged driving"; she also complained of lower extremity muscle spasm (tr. 441).  Dr. Fuhrmeister discussed with Plaintiff adding a muscle relaxant to her medication regimen, but Plaintiff declined (*id.*).  He assessed low back pain (but not lumbar radiculopathy), continued Plaintiff's other medications, and advised her to return in two months (*id.*).

On May 28, 2008, Plaintiff returned to Dr. Akerson (tr. 454). She told Dr. Akerson she had fallen due to weakness in her legs, and she hurt her ribs in the fall and had chest pain (*id.*). Dr. Akerson prescribed a chest x-ray and medication (*id.*). Plaintiff returned in June 2008 and again complained of chest pain, as well as numbness in her left arm (tr. 455). Dr. Akerson administered an electrocardiogram ("EKG") and assessed non-cardiac chest pain (tr. 455–56). On July 15, 2008, Plaintiff returned to Dr. Akerson's office with "disability papers from her back pain [sic] and lower ext[remity] weakness" and asked that the "paperwork [be] filled out by Dr. Akerson" (tr. 501). Dr. Akerson indicated that he filled out the paperwork (as described next), and he noted that "subjectively" Plaintiff was in a lot of pain and unable to get comfortable (*id.*). Dr. Akerson also examined Plaintiff and noted positive SLR tests, bilaterally, and limited leg range of motion with pain, bilaterally (*id.*). He assessed lumbar disc disease and back pain (*id.*).

On July 15, 2008, Dr. Akerson completed a form outlining Plaintiff's physical limitations, which form is presumably part of the disability paperwork mentioned in his treatment record (*see* tr. 458–61). He opined that Plaintiff was limited to lifting, carrying, or pulling less than ten pounds; standing no more than two hours in an eight-hour workday; and sitting less than five minutes in an eight-hour workday[9] (tr. 458–59). Dr. Akerson explained that these limitations were assessed in light of Plaintiff's compression fracture at L5 (tr. 459). With regard to postural limitations, Dr. Akerson opined that Plaintiff could occasionally (i.e., up to one-third of an eight-hour workday) crawl or stoop, but she could never climb, balance, kneel, or crouch (*id.*). In explaining these opinions, Dr. Akerson stated, "[Plaintiff] has severe pain (subjective) when doing above [postural] activities." (*id.*). Although Dr. Akerson assessed no manipulative limitations, when asked to explain the basis for assessing any such limitations he noted, "[Plaintiff] drops all items since injury per [Plaintiff]." (tr. 460). Next, Dr. Akerson assessed a variety of environmental limitations, including restrictions regarding exposure to temperature extremes, vibrations, machinery, heights, fumes, odors, chemicals, and gases; when asked to explain these limitations he stated, "[Plaintiff must refrain from] any climbing or walking due to fall risk." (tr. 461). Continuing, Dr. Akerson opined that Plaintiff would be absent from work more than three times a month (*id.*). Finally, Dr. Akerson stated that the

---

[9]The form offered two options regarding the duration Plaintiff can sit; one indicates "[l]ess than about 6 hours in an 8-hour workday," and the other indicates "about 8 hours in an 8-hour workday" (tr. 459). Dr. Askerson selected the former option but wrote next to it, "Less than 5 minutes." (tr. 459).

limitations he assessed apply from " 12/4/06 to  ? " (*id.*).  Also in July 2008, Dr. Akerson completed a form titled Assistive Device Questionnaire (tr. 463).  In pertinent part, he indicated on this form that Plaintiff occasionally used a cane for ambulation and that the cane was medically necessary, but he also indicated that Plaintiff could walk and stand without it (*id.*).  Additionally, in response to a question that asks, "When is the walker/can[e] medically necessary," Dr. Akerson stated, "N/A" (*id.*).

Plaintiff returned to Dr. Fuhrmeister on July 23, 2008, with complaints of low back pain and swelling, tenderness in her upper back, and numbness and burning, bilaterally, in the lower extremities (tr. 581).  A physical examination was essentially unremarkable, revealing "grossly normal extremity strength" and intact sensation, with only mild tenderness in the lumbar and thoracic muscles (but no evidence of spasm) and a mildly antalgic gait (tr. 583).  Dr. Fuhrmeister assessed low back pain and opined that Plaintiff's upper back pain was most likely due to deconditioning (tr. 584).  He prescribed home exercises, Flexeril, Lyrica, and Lidoderm patches for back pain (tr. 584, 586).  Plaintiff returned to Dr. Fuhrmeister in September and December 2008, and his treatment records from these visits are generally the same as his earlier, but recent, records (tr. 586–93).  Of note, in September Plaintiff complained of right leg numbness and swelling in the feet, and Dr. Fuhrmeister opined that the swelling was not related to her work injury and thus Plaintiff would have to seek treatment for it elsewhere (i.e., from her primary care physician) (tr. 586, 589).  And in December Plaintiff complained of headaches and similar symptoms as before but stated that, overall, her medication regimen was "working well" (tr. 590).

Plaintiff returned to Dr. Akerson in January 2009 (tr. 502).  She reported swelling in the hands, feet, and face, as well as pain in the feet at night (tr. 503).  She also stated she was smoking two pack of cigarettes daily, and Dr. Akerson noted a history of chronic obstructive pulmonary disease ("COPD") (tr. 502).  Plaintiff made no complaints of back pain, although a history of "pain management" is noted in the treatment record, and Dr. Akerson assessed no back-related diagnoses; he diagnosed only a vitamin deficiency and a possible allergic reaction (*see* tr. 502–03).

Plaintiff returned to Dr. Fuhrmeister on three occasions in 2009 (tr. 594–606).[10]  Plaintiff's complaints were generally the same as before (*see* tr. 594, 598, 602), although she reported additional

---

[10] Plaintiff also saw Dr. Akerson in 2009 for a variety of issues, including problems with urination, a sinus infection, a cyst, abdominal pain, and ringing in her ears (tr. 540, 533, 536, 541, 547, respectively).

complaints in March (tr. 594 (pain behind the knees)), June (tr. 598 (sleep difficulties)), and October (tr. 602) (wrist pain)).  Plaintiff's physical examinations were also generally the same (i.e., normal extremity strength and sensation (tr. 597), mildly antalgic gait (tr. 597, 600; *see also* tr. 604, noting same but indicating that Plaintiff was using a cane).   Dr. Fuhrmeister, however, noted no musculoskeletal abnormalities during these visits (*see* tr. 597, 600, 604).  Dr. Fuhrmeister's diagnosis (i.e., back pain) remained the same, as did his course of treatment/prescriptions, generally (*see* tr. 597, 601, 605).  Plaintiff returned to Dr. Fuhrmeister in April 2010.  The treatment notes are basically the same (*see* tr. 606–09), although on this occasion Dr. Fuhrmeister advised Plaintiff she need not return for six months (tr. 609) (as can be seen *supra*, Dr. Fuhrmeister previously scheduled shorter intervals).

Plaintiff returned to Dr. Akerson in May 2010 with complaints of nausea and other symptoms, none of which related to her back, and a physical examination was essentially normal (*see* tr. 550–51).

Plaintiff was hospitalized from July 14 through July 16, 2010, after complaining of right-sided weakness and face numbness, preceded by a month of "on and off" headaches (tr. 576).  An EKG was normal (tr. 561), and Plaintiff was assessed with transient ischemic attack ("TIA") (*see* tr. 576).  She returned to the hospital on July 18, 2010, and reported weakness in all extremities and difficulty with speech (tr. 569).[11]  Plaintiff also complained of intermittent headaches, extreme nausea (but no vomiting), and visual disturbances (*id.*).  Plaintiff reported a thirty-year history of smoking a pack of cigarettes daily, and chest x-rays suggested COPD (tr. 578).[12]  A magnetic resonance angiography ("MRA") of the brain showed a narrowing of the right anterior cerebral artery at its origin (tr. 574).  Plaintiff was discharged on July 21 with a diagnosis of TIA and narrowing of the right anterior cerebral artery (tr. 572).  She was urged to quit smoking in order to reduce the chance of another TIA (*id.*).  On July 22, 2010, Plaintiff advised Dr. Akerson that she had no problems since she was treated for the TIA and discharged from the hospital (tr. 554).

Plaintiff returned to Dr. Fuhrmeister on October 22, 2010 (which was after her date last insured (9/30/10) for DIB purposes), and reported increased pain since a fall in September (tr. 613).

---

[11]Plaintiff's musculoskeletal system was described as "normal" in one record, as were her "gait and station" (*see* tr. 559, 560), and in another record the only musculoskeletal abnormality noted was "myalgias" (tr. 562).

[12]Dr. Akerson attended to Plaintiff in the hospital, and he noted that Plaintiff had DDD but was "[s]table on Lortab," and he directed staff to continue administering the Lortab (tr. 571).

She also reported more frequent leg numbness, and she had an antalgic and shuffling gait (*id.*). Plaintiff stated that although Lortab was effective, she was only allowed to take one a day and therefore was unable to remain active throughout the day (tr. 614). Dr. Fuhrmeister adjusted her dosage to twice a day (*id.*). He also noted that Plaintiff's workers' compensation case had settled, and he assessed low back pain and advised Plaintiff to return in six months (tr. 613–14).

A December 14, 2010, brain MRI revealed only an insignificant abnormality (*see* tr. 565). Similarly, a MRA of the brain obtained the same day resulted in the following impression: "stable minimal narrowing of the proximal left ICA [internal carotid artery], likely of no significance. Otherwise, unremarkable MRA." (tr. 624). Finally, a lumbar spine MRI obtained the same day revealed the old compression fracture and repair, as well as a slight posterior protrusion of the bone of the compressed vertebra but no evidence of stenosis (tr. 567–68). The MRI report also notes, "findings are questionable regarding nerve root compression, but it is possible that there is compression of the descending nerve roots" at L4-5, related to ligament hypertrophy and the slightly protruding disc, which also resulted in a reduction of the spinal canal area (tr. 568).

On December 28, 2010, Plaintiff saw neurologist Karin Maddox, M.D., for follow up as to the recent MRI and MRA, as well as a pain management assessment (tr. 618).[13] Upon examination, Plaintiff was tender to palpation over the lumbar spine with paravertebral muscle spasm, trigger point tenderness, and decreased range of motion (*id.*). Dr. Maddox noted that Plaintiff's gait was antalgic and she used a cane for ambulation (tr. 617). Otherwise, Plaintiff's examination was largely unremarkable (*see* tr. 617–18). Dr. Maddox diagnosed a history of TIA, migraines, and lumbar radiculopathy, and she continued Plaintiff's medications and referred Plaintiff for lumbar facet injections (tr. 617).

C.      Evidence and Opinions from Non-Treating Sources

On October 2, 2007, upon referral from Dr. Stringer, Terra R. Towne, MOT, OTR, conducted a FCA (tr. 311–15). Ms. Towne observed Plaintiff perform a series of tasks—such as lifting, carrying, pushing, pulling, sitting, standing, walking, climbing, and balancing—in order to determine

---

[13] Dr. Maddox referenced a previous examination of Plaintiff and stated that Plaintiff's condition was "essentially unchanged from my previous evaluation" (tr. 618), but there is no evidence of a prior examination by Dr. Maddox in the record. Dr. Maddox is in practice with Dr. Elzawahry, but he conducted NCV/EMG studies of Plaintiff in June 2007, not a physical examination (*see* tr. 306–09). Dr. Maddox's reference to a prior examination thus appears to have been made in error.

Plaintiff's physical capacities, including the amount of weight she could lift, carry, push, or pull, and the length of time she could sit, stand, or walk (*see* tr. 313). Ms. Towne noted that Plaintiff "self-limited" on five of the fourteen tasks (or approximately 36% of the tasks) she was asked to perform (tr. 313, 315). Ms. Towne then explained that, in general, self-limiting behavior on less than 20% of the tasks is normal, when compared with motivated individuals; but self-limiting behavior on 21 to 33% of the tasks exceeds normal limits, and self-limiting behavior on more than 33% of the tasks—as Plaintiff did—significantly exceeds normal limits (tr. 315 (citing research conducted by the University of Alabama at Birmingham and reported in the <u>Journal of Occupational Medicine</u>, Sept. 1994)). Ms. Towne noted that Plaintiff previously performed her work as a home health aide at a medium level of exertion but, based on Plaintiff's performance on the tasks, she could not return to such work. Rather, Ms. Towne opined, Plaintiff could perform only sedentary work (tr. 311, 315). Ms. Towne specifically noted, however, that her opinion was "significantly influenced by [Plaintiff's] self-limiting behavior" and that the restriction to sedentary work indicated Plaintiff's "minimal rather than her maximal ability" (tr. 315). She also noted that Plaintiff's self-limiting behavior prevented an opinion as to Plaintiff's maximum capacities (*id.*).

On August 30, 2008, Plaintiff was examined by Adam Berliner, D.O., at the Commissioner's request (tr. 465–70). Plaintiff reported back pain and numbness that radiated into both legs and feet, as well as lower extremity weakness (tr. 465). She explained that the pain was intermittent but present most days and precipitated by activities of daily living, such as taking clothes out of the dryer, mopping, driving, and dressing (*id.*). She alleged that her pain increased with activity, but rest, medication, and use of a transcutaneous electrical nerve stimulation ("TENS") unit helped alleviate it (*id.*). Plaintiff reported that she occasionally used a cane for ambulation, but she was not using one at the time of Dr. Berliner's examination and did not need one to ambulate independently (tr. 465–66). Upon examination, Dr. Berliner noted that Plaintiff did not demonstrate pain behaviors, exhibit any difficulties getting on and off the examining table, or "appear acutely ill" (tr. 466). Dr. Berliner did note tenderness to palpation at L5-S1 and in the lower lumbar paraspinal muscles and bilateral SI joints, but a Patrick's test and SLR tests were negative bilaterally, and Plaintiff had full muscle strength in the upper and lower extremities, bilaterally (tr. 467). Plaintiff had an altered posture and some limits in range of motion with flexion and extension of the lumbar spine (*see* tr. 467–68). Range

of motion was full, however, in all other areas tested, including the cervical spine, shoulders, hands, hips, knees, and ankles (*see* tr. 468–70). Additionally, Plaintiff could toe-walk and tandem-walk but had minor difficulty heel-walking, bilaterally, and could not squat (tr. 467). Dr. Bernliner diagnosed a compression fracture at L5, status post kyphoplasty (*id.*).

On September 23, 2008, a non-examining agency physician, P.S. Krishnamurthy, M.D., opined that Plaintiff could perform work at the light level of exertion (*see* tr. 485–92).

On January 16, 2009, at the Commissioner's request, Plaintiff presented to Iqbal Faruqui, M.D., for a consultative examination (tr. 494–97). Plaintiff described her injury, pain, limitations, and course of treatment (tr. 494–95), and Dr. Faruqui reviewed the results of Plaintiff's previous consultative examination by Dr. Berliner (*see* tr. 496). He then examined Plaintiff. He noted mild diffuse tenderness of the paraspinal muscles with no significant spasm and no spinal column point tenderness (tr. 497). Plaintiff had full ranges of motion in all areas tested except with lumber extension and flexion, which were slightly reduced (*id.*). Plaintiff could not squat, and her gait was slightly antalgic (*id.*). A SLR test was negative for low back pain but reportedly caused "some pulling in [the] right foot" (*id.*). Finally, Dr. Faruqui noted that deep tendon reflexes were normal, as was Plaintiff's ability to tandem-walk, grip with full strength, and perform fine manipulation (*id.*). He assessed history of chronic back pain secondary to a compression fracture (*id.*). In closing, Dr. Faruqui stated that Plaintiff's examination was "generally unremarkable except that she looks uncomfortable all the time and somewhat anxious, depressed and irritable," and he noted that Plaintiff walked without an assistive device (*id.*).

On February 7, 2009, a second non-examining agency physician, Janet Gibson, D.O., opined Plaintiff could perform light exertional activity with the ability to alternate between sitting and standing (*see* tr. 505–12).

D.     Evidence Submitted to the Appeals Council (but not considered by the ALJ)

On February 28, 2011, Plaintiff submitted a letter from Dr. Maddox to the Appeals Council in conjunction with her request for review (tr. 285). In the letter Dr. Maddox noted Plaintiff's diagnosis of "severe degenerative disc disease resulting in chronic low and mid back pain with radiculopathy into [the] lower extremities," and in support of this diagnosis she referenced MRI

results and findings on examination (*id.*).[14]  She stated Plaintiff was being treated with pain medications and bilateral lumbar facet injections with "some success" but noted that Plaintiff's "condition has proven to be permanent and progressive" (*id.*).  She also stated that Plaintiff's use of a cane was medically necessary "due to episodes of leg buckling and imbalance from the radiculopathy" (*id.*).  Dr. Maddox also noted she had reviewed records from Dr. Stringer and "more recent [but unidentified] notes" and—apparently based on that review—opined that Plaintiff is capable of working at "no more than the sedentary level," which she described as lifting no more than ten pounds and "standing/walking no more than a total of 2 hours in an 8 hour day" (*id.*).  Continuing, Dr. Maddox opined that Plaintiff would likely "experience an increase in pain with prolonged upright sitting, computer use, etc., and as a result she may often be incapable of completing a full 8 hour day" (*id.*).  Thus, Dr. Maddox opined, Plaintiff would be more suited for part time work (i.e., four to six hours a day), with a sit/stand option and, ideally, flexible hours (*id.*).  Finally, Dr. Maddox opined that the limitations she assessed were applicable as of at least October 2, 2007, the date of Ms. Towne's FCA (*id.*).

V.      DISCUSSION

In this appeal, Plaintiff alleges the ALJ erred by:  (1) finding her less than fully credible; and (2) adopting the opinions of non-examining agency physicians and Ms. Towne, an occupational therapist, over those of Plaintiff's treating physicians.  She also contends the Appeals Council erred in denying her request for review.

A.      ALJ's Credibility Determination

After considering the medical evidence of record and Plaintiff's complaints of pain and other symptoms, the ALJ concluded that Plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms she alleges, but her statements concerning the intensity, persistence, and limiting effects of those symptoms are not credible to the extent they are inconsistent with her RFC

---

[14] Dr. Maddox did not identify the date the date of the MRI she reviewed, but it must have been the MRI obtained in December 2010 because Plaintiff presented to Dr. Maddox two weeks after that MRI and did so specifically for follow up as to that MRI (as well as the MRA).  Moreover, the December 2010 MRI is the only lumbar MRI of record that indicates nerve root compression.

(that is, for the full range of sedentary work) (tr. 37, 39, 40).[15]  Plaintiff contends the ALJ erred in making this finding and asserts, in relevant part, that the ALJ failed to consider significant medical evidence of record, made erroneous findings, and/or failed to sufficiently explain his findings (doc. 19 at 1, 16–20).

In Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991), the Eleventh Circuit articulated the "pain standard," which applies when a disability claimant attempts to establish a disability through her own testimony of pain or other subjective symptoms.  The pain standard requires:  (1) evidence of an underlying medical condition and either (a) objective medical evidence that confirms the severity of the alleged pain arising from that condition, or (b) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.  Holt, 921 F.2d at 1223 (internal citation omitted).  If a claimant testifies as to her subjective complaints of disabling pain and other symptoms, as Plaintiff did here, the ALJ must clearly "articulate explicit and adequate reasons" for discrediting the claimant's allegations of completely disabling symptoms. Foote v. Chater, 67 F.3d 1553, 1561–62 (11th Cir. 1995).  Additionally, "'[a]lthough this circuit does not require an explicit finding as to credibility, . . . the implication must be obvious to the reviewing court.'"  Id. at 1562 (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983)).  The credibility determination need not cite "'particular phrases or formulations,'" but it cannot merely be a broad rejection which is "not enough to enable [the court] to conclude that [the ALJ] considered her medical condition as a whole.'"  Id. (quoting Jamison v. Bowen, 814 F.2d 585, 588–90 (11th Cir. 1987)).

Here, the ALJ first articulated the correct pain standard (see tr. 37).  He then identified various reasons for discounting Plaintiff's complaints of disabling pain and limitations.  First, the ALJ found that the objective medical evidence of record does not support Plaintiff's allegations (tr. 37).  In support, he pointed to the CT scan of the lumbar spine, which Plaintiff obtained two days after the fall at work, which showed only minimal spondylosis with diffuse osteopenia (tr. 37).  The ALJ acknowledged that subsequent testing, including a MRI and x-rays from January and April of 2007,

---

[15]In one section of his opinion, in an obvious scrivener's error, the ALJ stated that Plaintiff's RFC was for light work (tr. 40).  The parties do not dispute—and it is clear to the undersigned—that the ALJ found that Plaintiff had the RFC to perform the full range of sedentary work and, as such, could return to her past relevant work as a customer service representative, which work she performed at a sedentary level of exertion (see, e.g., tr. 37, 41, 50).

revealed a compression fracture, but the ALJ also noted that Plaintiff underwent an open reduction and internal fixation of the fracture, with kyphoplasty, in May 2007 to address these abnormalities (*see id.*). Thereafter, objective tests obtained during the relevant period (i.e., on or before September 30, 2010) were largely unremarkable, including lumbosacral x-rays in late May 2007, which revealed only mild degenerative changes; a normal NCV study in June 2007; a lumbar MRI from June 2007, which revealed minimal findings; and the lumbar MRI from March 2008, which revealed some spondylosis but no evidence of root effects. In light of this evidence, the ALJ did not err in concluding that diagnostic tests, such as MRIs and x-rays, do not substantiate Plaintiff's complaints of ongoing, constant, and disabling back pain and other symptoms.

Plaintiff nevertheless contends that the ALJ erred because he cited a negative test result (i.e., the Patrick's test result) in support of his credibility findings, but—Plaintiff contends—the results of the Patrick's test do not undermine her complaints (doc. 19 at 17). Plaintiff also argues that the ALJ failed to mention "the numerous positive [SLR] tests, indicating nerve root compression [and other 'significant abnormalities'] and supporting Plaintiff's allegations," and failed to mention the abnormal EMG study (doc. 19 at 17–18). Plaintiff's arguments are not persuasive. Initially, with regard to the Patrick's test, the ALJ accurately described Dr. Berliner's findings. To illustrate, Dr. Berliner's report states, specifically with regard to his examination of Plaintiff's spine: "[Plaintiff] has tenderness to palpation in the midline at L5-S1 region and in the lower lumbar paraspinals. She also has tenderness to palpation in the bilateral sacral iliac joints. However, Patrick's test was negative bilaterally." (tr. 467). And the ALJ stated, with regard to Dr. Berliner's examination, "[Plaintiff] displayed tenderness to palpation in the midline at L5-S1 region and in the lower lumbar paraspinals, as well as tenderness to palpation in the bilateral sacral iliac. However, Patrick's test was negative bilaterally." (tr. 38). Thus, the ALJ did not err in considering the negative Patrick's test as part of his overall evaluation of Plaintiff's spinal condition and complaints of pain and numbness/weakness in the lower extremities.[16] With regard to SLR tests, Plaintiff claims the ALJ failed to consider "numerous" positive SLR tests, but the record does not support a finding that there were indeed

---

[16]The record shows that other diagnostic tests were also negative, such as the Babinski's test (*see, e.g.*, tr. 365, 467), Hoffmann's test (tr. 467), and deep tendon reflex tests (tr. 365, 393, 497), not to mention the numerous physical examinations that were largely unremarkable (with the exception of tenderness to palpation, some limits in lumbar range of motion, and at times a mildly antalgic gait).

numerous positive SLR tests. For example, in her memorandum Plaintiff references the following notations in Dr. Stringer's treatment records: (1) SLR tests that produced some mild low back pain at 75 degrees in December 2006 and May and June 2007; (2) SLR tests that caused low back pain "with no true radicular component" in May 2007; and (3) various SLR tests conducted between December 2006 and August 2007 (i.e., before or within a few months of Plaintiff's surgery) that were simply noted to cause pain (doc. 19 at 2–7, citing tr. 393, 351, 337, 347, 345, 342, 334, 331). None of these SLR tests, however, were specifically described as "positive," even though Dr. Stringer noted Plaintiff's reports of some pain with SLR testing (*see id.*). Stated another way, a SLR test is not deemed positive merely because a testee reports pain with testing.[17] To be sure, Dr. Fuhrmeister conducted SLR tests on June 20, 2008, and he specifically characterized the test results as "negative," even though Plaintiff reported lower back pain during the testing (tr. 418). Likewise, although Plaintiff reported pain with SLR testing by Dr. Stringer on May 24, 2007, approximately three weeks after her surgery, Dr. Stringer specifically noted that Plaintiff's lower back pain had "no true radicular component" (tr. 347). Plaintiff is correct in noting that Dr. Akerson, her family physician, reported a positive SLR on July 15, 2008 (tr. 501) and, further, that the ALJ did not mention this positive SLR test. However, given the multiple other negative SLR tests, the court finds that the ALJ's failure to mention this one test is—at best—harmless. As noted, Dr. Fuhrmeister found negative SLR tests less than one month before Dr. Akerson's test, and Dr. Berliner also (specifically) reported negative SLR tests when he examined Plaintiff a month after Dr. Akerson's test in August 2008 (tr. 467). Additionally, in January 2009 Dr. Faruqui noted negative SLR tests at 90 degrees, with no back pain. Thus, the undersigned concludes the ALJ did not err in failing to address "numerous" positive SLR tests that allegedly corroborate Plaintiff's complaints of pain, as the record contains no such evidence. To the contrary, the record contains only one notation of a positive SLR test. Therefore, the overall record in this regard may fairly be construed as establishing that Plaintiff's SLR tests did not confirm the presence of radiculopathy or other significant abnormalities. Moreover, there is no reversible error based solely on the ALJ's failure to mention the notation in Dr. Akerson's records. *See* Dyer

---

[17] *See, e.g.*, http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1495170/ (last visited Dec. 21, 2013) ("A positive response [to SLR testing] reproduces radiating leg pain when the limb is raised to less than 60°."); http://www.sh.lsuhsc.edu/fammed/outpatientmanual/lowbackpain.htm (last visited Dec. 21, 2013) ("A positive SLR is present when the patient experiences both back pain and pain into the posterior thigh at 60 degrees or less.")

v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) ("there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision," as long as the ALJ's decision "is not a broad rejection which is 'not enough to enable [the district court or this Court] to conclude that [the ALJ] considered her medical condition as a whole.'") (quoting Foote, 67 F.3d at 1561).

Finally, Plaintiff contends the ALJ noted a normal NCV study from June 2007 in support of his credibility findings, but failed to note the abnormal EMG study obtained at the same time (doc. 19 at 17). Plaintiff is mistaken. The ALJ specifically stated, "A nerve conduction study of the lower extremities was normal, but an electromyography was abnormal with a finding consistent with [or suspicious for] L5-S1 radiculopathy." (tr. 37). Thus, the ALJ indeed acknowledged the abnormal EMG and considered it, along with other evidence of record, in evaluating Plaintiff's credibility. Further, even though the June 2007 EMG suggested possible radiculopathy, other evidence obtained after the EMG suggested no radiculopathy, including Dr. Fuhrmeister's negative SLR tests in January 2008 (tr. 418); the March 2008 lumbar MRI, which showed some abnormalities but no evidence of any root effects (tr. 428); Dr. Berliner's negative SLR tests in August 2008 (tr. 467); and Dr. Faruqui's negative SLR tests in January 2009 (tr. 497). Although the December 2010 MRI noted "possible" and "questionable" nerve root compression, this MRI was obtained after the date Plaintiff was last insured for DIB purposes. Thus, during the relevant period, the only objective evidence of possible nerve root involvement is the EMG study from June 2007 and Dr. Akerson's positive SLR test on July 15, 2008 (tr. 501) (which date, incidentally, is the same day Plaintiff asked Dr. Akerson to fill out disability paperwork). On this record, the undersigned concludes that the ALJ's finding—with regard to the lack of objective medical evidence to support Plaintiff's complaints of disabling pain and limitations—is substantially supported by evidence in the record as a whole. As this court is well aware, the findings of the ALJ must be supported by substantial evidence, not unanimous evidence.

In further discounting Plaintiff's complaints, the ALJ noted that Plaintiff's medication was generally effective in controlling her pain (tr. 39). In support the ALJ pointed to evidence in the record, such as treatment notes indicating that Plaintiff's medication prevented her pain from being severe and that her pain improved with rest, medication, and the use of a TENS unit (*see, e.g.*, tr. 39, referencing tr. 444, 495). Plaintiff asserts error as to this finding, arguing that her "medications did not always control her pain" and, essentially, that they controlled her pain only to the extent she refrained from performing basic activities of daily living (doc. 19 at 17). In support, Plaintiff points

to instances in the record where she reported that her pain relief was "not good" or that her medications had to be adjusted (doc. 19 at 17). Even if evidence to the contrary of the ALJ's findings exists in the record, as Plaintiff suggests, the ALJ's findings cannot be overturned where "there is substantially supportive evidence" of his findings. Barron v. Sullivan, 924 F.2d 227, 230 (11th Cir. 1991). And here, there is such supportive evidence. For example, in July 2007 Plaintiff reported very little pain in her back and no radicular leg pain, and she stated she was walking more (tr. 335). Additionally, Dr. Stringer noted that Plaintiff experienced relief of her pain, and her activity level was adequate and could even be increased (tr. 330, 333). He also opined she could perform light duty work (*see, e.g.*, tr. 333). Dr. Fuhrmeister noted in January 2008 that Lyrica was "very effective in helping Plaintiff's leg pain" and that 70% of her back/leg pain was relieved with medication (tr. 414). Dr. Fuhrmeister also noted that Plaintiff's pain improved with sleeping, massage, and heat, and that she performed exercises such as weight lifting four times a week (tr. 415–16). Further, on December 23, 2008, Plaintiff reported that her medication regimen was working well (tr. 590). In July 2010, Dr. Akerson stated that Plaintiff was stable on Lortab (tr. 571). Also in 2010, Plaintiff advised Dr. Fuhrmeister that she was doing relatively well on her medications (tr. 593). Thus, the ALJ's finding has substantial support in the record, and he did not err in considering this factor—that Plaintiff's medication was generally effective in controlling her pain—in evaluating Plaintiff's credibility, even if evidence in the record arguably supports a contrary finding. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) ("Even if the evidence preponderates against the Commissioner's findings, we must affirm if the decision reached is supported by substantial evidence."); Crawford, 363 F.3d at 1158 (same); Barnes, 932 F.2d at 1358 (same); Walden, 672 F.2d at 838 (the court must abstain "from reweighing the evidence or substituting its own judgment for that of the [Commissioner]") (citations omitted); Barron, 924 F.2d at 230 ("Substantial evidence may even exist contrary to the findings of the ALJ, and we may have taken a different view of it as a factfinder. Yet, if there is substantially supportive evidence, the findings cannot be overturned.").

Continuing, the ALJ noted Plaintiff's relatively benign physical examinations, including those conducted by Dr. Berliner, Dr. Fuhrmeister, and Ms. Towne (tr. 38, 40), as well as Dr. Fuhrmeister's inability to explain Plaintiff's symptoms based on his review of objective medical evidence (tr. 38). These findings are well supported by the record.

Next, the ALJ considered evidence related to Plaintiff's activities of daily living and stated:

> Although the claimant has described daily activities which are fairly limited, two factors weigh against considering these allegations to be strong evidence in favor of finding the claimant disabled. First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Secondly, even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision. Overall, the claimant's reported limited daily activities are considered to be outweighed by the other factors discussed in this decision.

(tr. 39).

Plaintiff also challenges this finding. She contends that no objective verification of limited daily activities is required and that attributing Plaintiff's limitations to unspecified "other factors" is too vague to enable meaningful review by this court (doc. 19 at 20, citing Wolfe v. Comm'r of Soc. Sec., No. 6:11-CV-1316-ORL-DAB, 2012 WL 3264916, at *6 (M.D. Fla. Aug. 10, 2012)). Even if the Wolfe decision supports Plaintiff's arguments, nearly identical arguments were rejected by the Eleventh Circuit in Anderson v. Comm'r of Soc. Sec., 427 F. App'x 761, 764 (11th Cir. 2011), albeit in an unpublished decision. In Anderson, the court stated:

> The ALJ did not create additional hurdles to the pain standard that required Anderson to objectively prove her limited daily activity; rather, the ALJ merely indicated that Anderson's testimony about her allegedly limited activities was insufficient to prove that she suffered from disabling pain. The ALJ pointed out that (1) Anderson's statements about limited daily activities were hard to objectively verify, and (2) the limited nature of her activities could have been due to reasons other than pain given the weak medical evidence and other factors indicating that Anderson did not suffer from disabling pain.

Anderson, 427 F. App'x at 764.

Here, as in Anderson, the ALJ did not require Plaintiff to prove her limited daily activities by some method other than her own testimony. He merely indicated that Plaintiff's statements regarding her limited activities did not compel a finding that she suffered from disabling pain during the relevant period and, similarly, that if her activities were truly as limited as she alleged, they must have been so based on factors other than her pain, in view of the relatively weak medical evidence (and other considerations). Thus, consistent with the findings made in Anderson, the undersigned finds no error here.

In sum, the ALJ applied the correct pain standard and articulated his reasons for finding Plaintiff less than fully credible. Moreover, the reasons he identified are supported by substantial evidence in the record as a whole and were otherwise properly considered. Thus, Plaintiff is not entitled to relief on this claim.

B.      The Opinions of Dr. Akerson[18]

The ALJ acknowledged the opinions of Dr. Akerson, as contained on the forms he completed in July 2008 (which opinions are detailed, *supra*, and need not be repeated here (*see also* tr. 458–63)). The ALJ then assigned little weight to those opinions because Dr. Akerson "relied quite heavily" on Plaintiff's subjective complaints of pain and other symptoms, yet (for the reasons discussed in the preceding section of this Report) Plaintiff was not fully credible (tr. 40). Plaintiff contends the ALJ erred here, noting in part Dr. Akerson's status as a treating physician and arguing that the ALJ impermissibly assigned greater weight to the opinions of non-treating sources over those of Dr. Akerson.

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *See* <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1439-1441 (11th Cir. 1997); <u>Edwards v. Sullivan</u>, 937 F.2d 580, 583 (11th Cir. 1991); <u>Sabo v. Chater</u>, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d). "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1240–41 (11th Cir. 2004) (citation omitted). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See* <u>Edwards</u>, 937 F.2d 580 (finding that the ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements). However, if a treating physician's opinion on the nature and severity of a claimant's impairments is well supported by medically acceptable clinical

---

[18]Plaintiff refers to the opinions of "Dr. Ackerman" (*see* doc. 19 at 21–22), but there are no records from a Dr. Ackerman in the file, and the records Plaintiff references in support of this claim are those of Dr. Akerson (*see, e.g., id.*, citing tr. 459–60). It is thus evident that this claim relates to Dr. Akerson, Plaintiff's primary care physician.

and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(c)(2).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) medical evidence supporting the opinion; 4) consistency with the record as a whole; 5) specialization in the medical issues at issue; and 6) other factors which tend to support or contradict the opinion. *Id.* Generally, a treating physician's opinion is entitled to more weight than a consulting physician's opinion. *See* Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir. 1984).

Here, the ALJ did not err in rejecting the opinions of Dr. Akerson because they were based on Plaintiff's subjective complaints. First, the ALJ's statement is accurate, as the forms completed by Dr. Akerson indicate that he indeed largely based his opinions on Plaintiff's subjective complaints. For example, in explaining his opinions Dr. Akerson stated, "[Plaintiff] has severe pain (subjective) when doing above [postural] activities." (tr. 459). He also stated, "[Plaintiff] drops all items since injury per [Plaintiff]." (tr. 460). And he wrote on the form Plaintiff's report that her "legs go numb after 45 minutes" (*see* tr. 458).[19] Second, the ALJ properly considered this reason in rejecting the opinions. *See, e.g.*, Hartline v. Astrue, 605 F. Supp. 2d 194, 209 (D.D.C. 2009) ("Because the ALJ found that the opinions of [two treating physicians] were not well-supported by objective findings and/or treatment records and appeared to overly rely on the claimant's subjective complaints he was justified in according them less weight in his analysis.") (internal quotations and alteration omitted).

Additionally, while not stated directly, the ALJ's finding—that Dr. Akerson's opinions are based on Plaintiff's subjective complaints—may reasonably be construed as a finding that Dr. Akerson's opinions are not "well-supported by medically acceptable clinical and laboratory diagnostic techniques," as is required for the opinions to have controlling authority under 20 C.F.R. § 404.1527(c)(2). Or, similarly, the ALJ's finding is akin to a finding that Dr. Akerson's opinions are

---

[19] As Plaintiff points out, Dr. Akerson did indicate that Plaintiff's lifting, carrying, standing, and sitting limitations were assessed in light of Plaintiff's compression fracture at L5 (doc. 19 at 21, citing tr. 459). However, as previously noted, the ALJ's findings need not be based on a unanimous record, only substantial evidence. It is clear from a review of the forms completed by Dr. Akerson that his opinions were largely—nearly exclusively—based on Plaintiff's subjective complaints (*see* tr. 458–61).

not bolstered by credible evidence in the record.  <u>Phillips</u>, 357 F.3d at 1240–41.  Thus, the undersigned concludes that the ALJ articulated good cause for rejecting the opinions.

It should also be noted that preprinted forms, such as those completed by Dr. Akerson, do not provide persuasive evidence of the validity of the opinions expressed therein.  *See, e.g.*, <u>Hammersley v. Astrue</u>, No. 5:08cv245-Oc-10GRJ, 2009 WL 3053707, at *6 (M.D. Fla. Sept. 18, 2009) ("check-off forms . . . have limited probative value because they are conclusory and provide little narrative or insight into the reasons behind the conclusions") (citing <u>Spencer ex rel. Spencer v. Heckler</u>, 765 F.2d 1090, 1094 (11th Cir. 1985) (rejecting opinion from a non-examining physician who merely checked boxes on a form without providing any explanation for his conclusions); <u>Mason v. Shalala</u>, 994 F.2d 1058, 1065 (3d Cir. 1993) (noting that "[f]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best.")).

Thus, having properly discounted the extreme limitations assessed by Dr. Akerson on the check-off forms, the ALJ did not err in relying on other evidence in the record to determine that Plaintiff could perform work at a sedentary level of exertion.  The ALJ noted that the RFC for sedentary work is consistent with the opinions of Ms. Towne (who opined that, <u>at a minimum</u>, Plaintiff could perform sedentary work), to which he assigned significant weight (tr. 40).  The ALJ also assigned significant weight to the opinions of the non-examining agency physicians (*id.*), who—incidentally—both opined that Plaintiff had greater physical capacities than those set forth in the RFC and those assessed by Ms. Towne.  Finally, the ALJ evidently considered Plaintiff's performance on multiple physical examinations in support of his overall conclusions (*see, e.g.*, tr. 38, discussing the examinations by Dr. Berliner and Dr. Faruqui).

Although Ms. Towne is not a physician, and Plaintiff claims the ALJ erred in relying on her opinions (doc. 19 at 23–24), any such error does not entitle Plaintiff to relief.  Initially, in March 2008, Dr. Fuhrmeister—a treating physician—noted that he concurred with Ms. Towne's opinions and he adopted those opinions (*see* tr. 435, assessing "[w]ork restrictions as per previous [FCA]").  Moreover, having properly discounted Dr. Akerson's opinions, the ALJ could have relied on the opinions of the non-examining agency physicians, Dr. Krishnamurthy and Dr. Gibson, the only other opinions of record that directly address Plaintiff's RFC (save for Dr. Maddox's opinions, which are discussed in the following section of this Report).  And had the ALJ done so, Plaintiff's RFC would have been for light work.  Thus, in actuality, the ALJ gave Plaintiff "the benefit of the doubt" by

adopting Ms. Towne's opinions, even though Ms. Towne directly stated that Plaintiff self-limited on an inordinately large percentage of the tasks she was asked to perform, and it is evident from Ms. Towne's report that she believed Plaintiff could likely work at a greater exertional level, as did Dr. Krishnamurthy and Dr. Gibson. Therefore, any error in assigning significant weight to Ms. Towne's opinions is harmless.

Finally, to the extent Plaintiff contends that in determining her RFC the ALJ was required to choose the opinion of a particular physician, such as Dr. Akerson (*see* doc. 19 at 21–22), the contention is unavailing. *See, e.g.,* Schmidt v. Apfel, 496 F.3d 833, 845 (7th Cir. 2007) (holding that in determining a claimant's RFC, "the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions of the claimant's physicians"). Similarly, as the Tenth Circuit recently noted:

> [T]here is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question. "[T]he ALJ, not a physician, is charged with determining a claimant's RFC from the medical record." Howard v. Barnhart, 379 F.3d 945, 949 (10th Cir. 2004) (following 20 C.F.R. § 416.927(e)(2) and SSR 96–59, 1996 WL 374183, at *5); *see also* 20 C.F.R. §§ 404.1546(c) and 416.946(c). We have thus "rejected [the] argument that there must be specific, affirmative, medical evidence on the record as to each requirement of an exertional work level before an ALJ can determine RFC within that category." Howard, 379 F.3d at 949; *see, e.g.,* Wall [v. Astrue], 561 F.3d [1048,] 1068–69 [(10th Cir. 2009)] (upholding ALJ's findings on mental impairment where record did not contain any treating or examining medical opinions as to allegedly disabling pain disorder); Bernal v. Bowen, 851 F.2d 297, 302–03 (10th Cir. 1988) (holding ALJ properly made mental RFC findings without expert medical assistance).

Chapo v. Astrue, 682 F.3d 1285, 1288–89 (10th Cir. 2012) (footnote omitted). *See also* Nation v. Barnhart, 153 F. App'x 597 (11th Cir. 2005) (unpublished) ("The ALJ is not required to seek additional independent expert medical testimony before making a disability determination if the record is sufficient and additional expert testimony is not necessary for an informed decision."); Poke v. Astrue, No. 1:10CV768-CSC, 2012 WL 174472, at *4 & n.10 (M.D. Ala. Jan. 23, 2012) ("[T]he court disagrees to the extent that these cases [from other district courts] suggest that the fourth-step [RFC] determination must be based on a medical source evaluation. . . . Nation does not stand for the proposition that an ALJ must always secure an [sic] residual functional capacity evaluation [or assessment] from a medical source."). As can be seen then, an ALJ must develop the RFC based on the entire record, not the opinion of one physician. Here, the ALJ did as he was required to do.

C.      Evidence Submitted to the Appeals Council

As previously noted, Plaintiff requested review by the Appeals Council ("AC") of the ALJ's unfavorable decision, and she submitted additional evidence to the AC in support of her request (that is, Dr. Maddox's letter dated February 28, 2011) (*see* tr. 5–6, 284–85). The AC denied review after determining, in relevant part, that Dr. Maddox's "narrative opinion" had no "material bearing on the [ALJ's] decision and would not change the [ALJ's] findings" (tr. 6). Plaintiff claims the AC erred in so concluding (*see* doc. 19 at 24–25).

A social security claimant generally is permitted to present new evidence at each stage of the administrative process. *See* 20 C.F.R. § 404.900(b); *see also* Ingram, 496 F.3d at 1261. The AC has the discretion not to review the ALJ's denial of benefits. 20 C.F.R. § 404.967. But the AC must consider "new and material evidence" that "relates to the period on or before the date of [the ALJ] hearing decision" and must review the case if the ALJ's "action, findings, or conclusion is contrary to the weight of the evidence currently of record." 20 C.F.R. § 404.970(b).

Additionally, there are two methods by which a reviewing court may remand a cause under 42 U.S.C. § 405(g)—"sentence four remands" and "sentence six remands." Ingram, 496 F.3d at 1261. A sentence four remand is appropriate when the claimant submitted new evidence to the AC, which the AC did not adequately consider in denying the claimant's request for review.[20] *Id.* at 1268. To obtain a sentence four remand, the claimant must show that, in light of the new evidence submitted to the AC, the ALJ's decision to deny benefits is not supported by substantial evidence in the record as a whole or, similarly, that the new evidence renders the denial of benefits erroneous.[21] *Id.* at 1262, 1266–67; *see also* 20 C.F.R. § 404.970(b).

Here, Plaintiff has not made, and cannot make, the requisite showing to warrant a sentence four remand based on the new evidence she presented to the AC. Initially, Dr. Maddox's letter is dated February 28, 2011, and in it she offers retrospective opinions as to Plaintiff's capacities (e.g., Dr.

---

[20]In contrast, a sentence six remand is appropriate only when the claimant submits evidence for the first time to the district court that might have changed the outcome of the administrative proceeding. Ingram, 496 F.3d at 1267–68. As Plaintiff submitted no new evidence to this court, a remand under sentence six would be inappropriate.

[21]The fourth sentence of § 405(g), which is applicable here, provides the federal court with the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

Maddox states that she reviewed records from the Brain and Spine Center/Dr. Springer and "more recent [but unidentified] notes" and then opines that Plaintiff is limited to functioning in a work setting at no more than the sedentary level and that Plaintiff's restrictions "would have been in place at least back to 10/2/2007 [the date of Ms. Towne's FCA]" (tr. 285)). Dr. Maddox, however, did not begin treating Plaintiff until late December 2010, which was after Plaintiff's date last insured for DIB purposes. *See* <u>Carroll v. Soc. Sec. Admin., Com'r</u>, 453 F. App'x 889, 893 (11th Cir. 2011) (unpublished) (finding that, in discounting treating physician's opinion, ALJ did not err in considering that the physician did not treat the claimant until after her date last insured or conclude she was disabled during the eligibility period at issue; also noting that the treating physician's records "do not reflect that he conducted any psychological tests during his treatment of Carroll, much less any that could retrospectively establish her disability."). Moreover, as noted *supra*, in support of her opinions Dr. Maddox specifically referenced MRI results that "confirm impingement of the L5 vertebral body" (tr. 285). This MRI, however, was obtained on December 14, 2010, after the relevant period. " Evidence is irrelevant and immaterial when it relates to a time period after the eligibility determination at issue." *Id.* at 892 (citing <u>Wilson v. Apfel</u>, 179 F.3d 1276, 1278–79 (11th Cir. 1999) (per curiam) (explaining that a medical opinion given one year after the denial of benefits "may be relevant to whether a deterioration in [the claimant's] condition subsequently entitled her to benefits" but is not probative to the issue of eligibility during the time period for which benefits were denied)). Further, Dr. Maddox's opinions contradict those of Dr. Stringer, a neurologist who treated Plaintiff during the relevant period and released her to light duty work, as well as the opinions of Dr. Fuhrmeister, another treating physician, who found Plaintiff capable of performing sedentary work during the relevant period. Finally, it is worth noting that Dr. Maddox's opinions are not substantially inconsistent with the ALJ's RFC determination. As previously discussed, Dr. Maddox found Plaintiff capable of performing work at a sedentary level, with lifting no more than ten pounds and walking or standing no more than two hours in an eight-hour workday. *Cf.* 20 C.F.R. § 404.1567(a) ("Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."). Although Dr. Maddox additionally opined that Plaintiff might experience pain with long bouts of

sitting, might be unable to complete eight-hour workdays all the time, and might be unable to work more than six hours a day, she nevertheless found Plaintiff capable of working. Importantly, she rendered these opinions after reviewing the December 2010 MRI, which arguably demonstrates a worsening of Plaintiff's condition (after her date last insured), but she nevertheless concluded that Plaintiff could work—and—could work with restrictions that are quite similar to those set forth in the RFC.

In sum, the information contained in Dr. Maddox's letter dated February 28, 2011, does not render the ALJ's actions, findings, or conclusions contrary to the weight of the evidence of record, and does not render the denial of benefits erroneous. 20 C.F.R. § 404.970(b). Thus, a remand pursuant to sentence four of § 405(g) is not warranted.

VI.     CONCLUSION

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed. 42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at1560. Furthermore, Plaintiff has failed to show that the ALJ or the AC applied improper legal standards, erred in making their findings, or that any other ground for reversal exists.

Accordingly, it is **ORDERED** that:

Carolyn W. Colvin is substituted for Michael J. Astrue as Defendant in this action. And it is respectfully **RECOMMENDED** that:

The decision of the Commissioner be **AFFIRMED**, this action be **DISMISSED,** and the clerk be directed to close the file.

At Pensacola, Florida this 3rd day of January 2014.


/s/ Elizabeth M. Timothy
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Any objections to these proposed recommendations must be filed within fourteen (14) days after being served a copy hereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings. *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**